**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:23-CR-0083 (RCL)** |
| **v.** | : | |
| | : | |
| **ZVONIMIR JURLINA,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Zvonimir Jurlina to 14 days' incarceration, as part of a 36-month term of probation, 60 hours of community service, and $500 in restitution. Jurlina was part of a violent mob that assaulted members of the news media and destroyed property associated with the news media at the east front of the Capitol on January 6, 2021.

I.     **Introduction**

Defendant Zvonimir Jurlina participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Jurlina pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(F). A short sentence of incarceration as part of a term of probation is appropriate in this case because Jurlina participated in the assault on the media staging area and incited violent acts of destruction.

1

The Court must also consider that Jurlina's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Jurlina's crime support a sentence of 14 days of incarceration as part of a sentence of 36 months' probation.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7.

### Jurlina's Role in the January 6, 2021 Attack on the Capitol

Jurlina traveled to Washington, D.C., from his residence in New York prior to January 6, 2021. On January 6, in the afternoon, Jurlina went to the Capitol grounds.

At approximately 4:50 p.m., a large crowd made its way to and/or past a media staging area that was set up outside the northeast corner of the U.S. Capitol, on U.S. Capitol grounds. As individuals moved past metal barricades that had been set up around the staging area, media members were forced to flee the area before recovering all their cameras and associated equipment. Numerous members of the crowd began to destroy the equipment, including cameras, tripods, lights, shades, and remote broadcasting equipment that belonged to various media outlets. Numerous members of the crowd yelled inflammatory rhetoric against the members of the media. One member of the media who was forced to flee the scene estimated that the equipment from his particular news organization that was destroyed was valued at between $30,000 and $34,000. Image 1 below depicts the staging area after the members of the news media had been forced to flee.



**Image 1**
Screen shot from open-source, showing rioters destroying media equipment at the media staging area on Capitol grounds. *Jurlina is not visible in this screen shot.*

Jurlina live-streamed events at the U.S. Capitol on January 6, 2021 in a twelve-part video series. The video series was originally posted to YouTube channel "Zykotik." One of the videos in the series, titled: "'Zykotik' in DC on Jan. 6, Part 11" depicts the narrator of the video, Jurlina, at approximately 3:10 minutes into the video stating, "Yes, Yes! Oh shit. Yo boys, we got…this, this is our fucking shit! Wooo. Wooo. Fuck yeah! Fuck yeah!" At the same time, other participants in the attack on the media were seen stomping on what appeared to be a camera affixed to a tripod.

At approximately 3:20 minutes into the same video, a man who appeared to have been a cameraman for a media outlet walked across the forefront of the video and Jurlina stated, "Yo, your camera…is busted boy. Your camera is busted." At approximately 3:35 minutes into the video, Jurlina said, "Yo, I guess we should loot now, right? This is pretty expensive equipment.

I'm thinking maybe I should just grab it up and then go to a pawn shop." At approximately 3:55 minutes into the video, Jurlina stated, "I've got a souvenir. Haha."

At approximately 4:00 minutes into the same video, Jurlina turned the camera around to film himself. Jurlina was holding in his hand a microphone with an orange top with the logo for ZDF, a German television broadcaster (Images 2, 3, and 4, below). Jurlina stated, "This is reporter Zykotik coming to you live. We are, haha. This is the real news media network. We have taken over. This is mother fucking America first. This is how we do it. No more fucking around."



**Image 2**



**Image 3**



**Image 4**

At approximately 4:35 minutes into the same video, Jurlina stated, "Sorry folks, we got some breaking news here, we got some breaking news here," then laughs and twice made a grunting noise that coincided with the sound of breaking equipment at approximately 4:45 in the same video. At approximately 5:25 minutes into the video, Jurlina can be seen kicking a piece of media equipment. At approximately 6:49 minutes into the video titled "'Zykotik' in DC on Jan. 6, Part 11," Jurlina can be seen handing a small blue object to a white male in a burgundy-colored sweatshirt (Figure 5 below). The white male in the burgundy-colored sweatshirt, identified as charged defendant Peter Harding (*United States v. Peter Harding*, 23-cr-0080 (ABJ)), was seen a short time later on the video kneeling in an alleged attempt to set fire to the pile of what remained of the media equipment (Figure 6). As Harding struggled to light the equipment on fire, Jurlina stated at approximately 7:09 minutes into the same video, "I tried. Little Marco Rubio gave me that lighter." (Figure 7). At approximately 8:37 minutes into the same video, Jurlina stated, "Let's see if I can help this dude out. Maybe I've got a Zippo or something."



**Image 5**



**Image 6**



**Image 7**

At approximately 9:20 minutes into the same video Jurlina said, "That's a nice ass bag bro. I might just jack that." At approximately 9:50 minutes into the video, Jurlina said, "It's abandoned property. This is abandoned property. It's not theft. It's abandoned property as you can see. They ran away. Right? It's not theft. It's not theft. I didn't …Zykotik did nothing wrong."

A publicly available video posted on Twitter showed Jurlina, at approximately 9 seconds into the video, handing something to charged defendant Peter Harding (referenced above) who then attempts to set fire to the pile of abandoned media equipment. Prior to handing something to Harding, Jurlina lit what appeared to be a cigarette.

In another video streamed by "Zykotik," at approximately 0:24 minutes into the video, Jurlina said, "I already got the microphone. The microphone's enough." An unidentified male on the video stated, "Some guy got a camera." Jurlina replied, "Oh, he got a camera? The whole thing? That was probably the guy I told…I was like you…we should just like take this. This is pretty expensive shit. I bet you that dude was like, yeah. That was like…how much you think? Maybe like fucking $5,000 or something?"

Jurlina was live-streaming at the time of his arrest on June 29, 2021. When he was arrested, he screamed several expletives at law enforcement before the transmission ended. He agreed to speak with law enforcement while being transported prior to his initial appearance. He indicated that he did not believe that resources should be used to prosecute persons such as himself who went to the Capitol on January 6, 2021. He further stated that he went to the "Stop the Steal" rally on January 6, 2021 at the U.S. Capitol, but that he did not do anything wrong. He later publicly called upon Donald Trump to pay for his legal defense fees. He has not expressed remorse for his actions on January 6.

*The Charges and Plea Agreement*

On June 23, 2021, the United States charged Jurlina by criminal complaint with violating 40 U.S.C. § 5104(e)(2)(F), Act of Physical Violence on Grounds. On June 29, 2021, law enforcement officers arrested him in Austin, Texas. On March 14, 2023, the United States charged Jurlina by a one-count Information with violating 40 U.S.C. § 5104(e)(2)(F). On April 19, 2023, pursuant to a plea agreement, Jurlina pleaded guilty to Count One of the Information. By plea agreement, Jurlina agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Jurlina now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(F). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. Jurlina must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 14 days' incarceration as part of a 36-month term of probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while

staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Jurlina's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

One of the most important factors in Jurlina's celebration of violence against members of the media during the riot. Jurlina attempted to steal a microphone, stomped on media equipment, assisted another rioter in attempting to set fire to the media equipment, and yelled at media members to leave the area in an apparent attempt to disrupt the media from continuing with live broadcasts of events at the U.S. Capitol that day. In doing so, Jurlina was attacking the free press, and the means by which citizens are kept informed about their government and current events.

Accordingly, the nature and the circumstances of this offense establish the need for a sentence of 14 days' incarceration as part of a 36-month term of probation in this matter.

## B. The History and Characteristics of Jurlina

Jurlina is a 33-year-old roadside technician assistant. PSR ¶ 45. He does not have previous criminal convictions.

## C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. Jurlina did not enter the Capitol, but he did engage in destructive and violent activity towards persons on the grounds who were doing their job by keeping citizens and the world apprised of what was occurring on that date. As with the nature and circumstances of the offense, this factor supports a short sentence of incarceration.

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2) (B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. At 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to

convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

During the presentence interview with the United States Probation Officer, Jurlina did not make a statement. He has not expressed remorse for his conduct on January 6, 2021.

A period of incarceration as part of a probation sentence is warranted in order to deter him from engaging in such activities in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[1] This Court must sentence Jurlina based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct.

Jurlina pleaded guilty to Count One of the Information, charging him with Act of Physical Violence on Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted

---

[1] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Sorvisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

There have been few other convictions for 40 U.S.C. § 5104(e)(2)(F) to date. Nonetheless, this case is comparable to many other parading and demonstrating cases that have been sentenced in this Court, a few of which are highlighted below:

In *United States v. Katherine Stavely Schwab,* 21-cr-050 (CRC), the defendant anticipated and prepared for potential violence on January 6; she chose to join the crowd at the Capitol after learning that it was the site of an ongoing riot; when entering the Capitol, she could see broken windows and hear blaring alarms; after she exited from the Capitol building, she saw and recorded video on her phone of police officers struggling to disperse the crowd; she shouted epithets at the officers who were valiantly trying to protect the Capitol and its lawful occupants, calling them "traitors" and thereby possibly inflaming the crowd; she shouted for others to resist police efforts to disperse the crowd; outside the Capitol, she joined a Facebook livestream and announced that she "stood her ground"; as rioters violently destroyed press equipment in a media enclosure, she joined others in shouting insults intended to incite further violence; she then joined the violence, throwing and kicking press equipment; and she later lied to the FBI. Upon Schwab's guilty plea to a violation of 18 U.S.C. § 1752(a)(2), the court sentenced Schwab to 45 days' incarceration. Like Schwab, as rioters violently destroyed press equipment, Jurlina joined in the violence, stomping on equipment and yelling at members of the media. While Jurlina has pled guilty to a less serious offense than Schwab, a short sentence of incarceration is likewise appropriate here.

Similarly, in *United States v. Eric Barber,* 21-cr-228 (CRC), the defendant prepared for violence by wearing a Kevlar ballistic helmet to Washington, D.C.; heard the crowd yelling "Hang Mike Pence" and saw the gallows erected by the rioters but entered the Capitol nonetheless, via a broken window; witnessed violence against police as he wandered through the Capitol; stole a power station from a C-Span media station; participated in a media interview in which he lied

about not entering the Capitol; and had a substantial criminal history, including a prior conviction

for breaking and entering. Upon his conviction of violation 18 U.S.C. § 5104(e)(2)(G), the Court

sentenced him to 45 days' incarceration. Once again, while Barber's conduct was more serious

than Jurlina's conduct, a short sentence of incarceration is likewise appropriate in Jurlina's case.

In *United States v. Chase Allen*, 22-cr-361 (DLF), the defendant joined the crowd in

proceeding to the Capitol on January 6, and engaged in destructive conduct in the media staging

area, similar to Jurlina. He stomped on a piece of equipment and yelled at members of the media.

When confronted by the FBI, he misrepresented his participation in the riot on that date. He pled

guilty to one count of 40 U.S.C. § 5104(e)(2)(F), and was sentenced to 36-months probation, with

14 days' incarceration as a special conduction of probation. Jurlina's conduct was more extreme

than Allen's, but he did not lie to the FBI as Allen did, but neither has he expressed remorse for

his conduct.

Last, in *United States v. Gabriel Brown*, 23-cr-009 (CJN), the defendant pled guilty to 18

U.S.C. § 1752(a)(1) and 40 U.S.C. § 5104(e)(2)(F), based on his actions on the media staging area

and the west front of the Capitol. Brown yelled expletives at the members of the media in the

staging area, and incited violence against their equipment, similar to Jurlina. Brown was sentenced

to 20 days' incarceration, and one year of supervised release.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is

"only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[2]

---

[2] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

    In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

    In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

**V.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Jurlina to 14 days' incarceration, as part of a 36-month term of probation, 60 hours community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:      *Jennifer Leigh Blackwell*
         Jennifer Leigh Blackwell
         Assistant United States Attorney
         United States Attorney's Office
         For the District of Columbia
         D.C. Bar No. 481097
         Jennifer.blackwell3@usdoj.gov
         (202) 803-1590